1  VORYS, SATER, SEYMOUR AND PEASE LLP
   Adam C. Sherman (SBN 224979)
2    acsherman@vorys.com
   Emily A. Papania (SBN 325027)
3    eapapania@vorys.com
4  4675 MacArthur Court
   Suite 700
5  Newport Beach, California 92660
   Telephone:  (949) 526-7900
6  Facsimile:  (513) 852-8468
7
   Attorneys for Plaintiffs HERBALIFE
8  INTERNATIONAL OF AMERICA,
   INC. and HERBALIFE
9  INTERNATIONAL, INC.
10
11              **UNITED STATES DISTRICT COURT**
12      **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**
13
14  HERBALIFE INTERNATIONAL              Case No: 2:21-cv-3445
15  OF AMERICA, INC., a Nevada
    corporation, and HERBALIFE
16  INTERNATIONAL, INC. a Nevada         **COMPLAINT FOR INJUNCTIVE,**
    corporation,                         **AND OTHER RELIEF FOR**
17                                       **VIOLATION OF 15 U.S.C § 1114;**
18               Plaintiffs,             **15 U.S.C. § 1125(a); TORTIOUS**
                                         **INTERFERENCE AND RELATED**
19         v.                            **CLAIMS**
20
21  GOLIATH INNOVATIONS, LLC, a          **DEMAND FOR JURY TRIAL**
22  Wyoming limited liability company,
    and CHASE HOSEA, a natural
23  person,
24               Defendants.
25
26
27      Plaintiffs  Herbalife  International  of  America,  Inc.  and  Herbalife
28  International, Inc. (collectively, "Plaintiffs") bring this action against Defendants

COMPLAINT - 1

Goliath Innovations, LLC and Chase Hosea (collectively, "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125; unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A); common law trademark infringement; unfair competition in violation of Cal. Bus. and Prof. Code § 17200; and tortious interference with contract and business relations.  These claims arise from Defendants' misappropriation of Plaintiffs' trademarks in connection with Defendants' unlawful and unauthorized sale of materially different and non-genuine products bearing Plaintiffs' trademarks on the Internet to unwitting customers.  In support of their complaint, Plaintiffs allege as follows:

## PARTIES

1.     Herbalife International of America, Inc. ("Herbalife") is a Nevada corporation with its principal place of business in Los Angeles, California.

2.     Herbalife International, Inc. ("Herbalife International") is a Nevada corporation with its principal place of business in Los Angeles, California.

3.     Goliath Innovations, LLC ("Goliath Innovations") is a limited liability company, organized under the laws of the State of Wyoming, with its principal place of business located at 133 New Orleans Dr., El Paso, TX 79912 according to corporate documents filed with the Wyoming Secretary of State.  Goliath Innovations operates or assists in the operation of an online storefront on www.amazon.com ("Amazon") that is currently called "eVolved Commerce." This storefront can be accessed at https://www.amazon.com/sp?seller=A2S7WTB059G58W.  Goliath Innovations does business throughout the United States through the "eVolved Commerce" storefront, including in California.

4.     Chase Hosea ("Hosea") is a natural person who, upon information and belief, resides at 6820 Granero Dr., El Paso, TX 79912.  Hosea operates or assists in the operation of the "eVolved Commerce" storefront on Amazon.  Hosea does

business throughout the United States through the "eVolved Commerce" storefront, including in California.

5. Corporate documents filed with the Wyoming Secretary of State list Hosea as an "Owner" and "Officer" of Goliath Innovations, and do not list any other individuals as officers or members of Goliath Innovations. Accordingly, upon information and belief, Hosea is in control of, a member of, and primarily responsible for Goliath Innovations and its actions.

6. Plaintiffs assert claims against Hosea in both his individual capacity as well as his capacity as a member of Goliath Innovations.

7. Until they conduct discovery, Plaintiffs cannot determine whether Hosea in his individual capacity, Goliath Innovations, or both operate the "eVolved Commerce" Amazon storefront. Upon information and belief, both Hosea in his individual capacity and Goliath Innovations assist in the operation of the "eVolved Commerce" Amazon storefront.

8. Alternatively, upon information and belief, Hosea directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Plaintiffs' trademarks by Goliath Innovations. Accordingly, Hosea is personally liable for infringing activities of Goliath Innovations without regard to piercing the corporate veil.

9. Alternatively, on information and belief, Goliath Innovations follows so few corporate formalities and is so dominated by Hosea that it is merely an alter ego of Hosea. This is reflected, in part, by the fact that Goliath Innovations has been administratively dissolved by the Wyoming Secretary of State on two occasions since 2015 for failing to pay annual taxes (before being later reinstated). Accordingly, Plaintiffs are entitled to pierce the corporate veil of Goliath Innovations and hold Hosea personally liable for the infringing activities of Goliath Innovations.

## **JURISDICTION**

10.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.  Plaintiffs' federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a), and Plaintiffs' claims arising under the laws of the State of California are substantially related to their federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

11.     This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of California and established sufficient minimum contacts with California by, among other things, advertising and selling infringing products bearing Plaintiffs' trademarks to consumers within California through one or more highly interactive commercial websites, through the regular course of business, with knowledge that Plaintiffs are located in California and are harmed in California as a result of Defendants' sales of infringing products bearing Plaintiffs' trademarks to California residents. Defendants have known that Plaintiffs are located in California, among other reasons, because Plaintiffs informed Defendants in cease-and-desist letters that they are located in California and are being harmed in California by Defendants' sales of infringing products.  The products bearing Plaintiffs' trademarks that Defendants are selling also identify Herbalife as a company located in Los Angeles, California.  Plaintiffs' claims arise out of Defendants' sales of infringing Herbalife products to California residents through the regular course of business.

## **VENUE**

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district or, in the alternative, because a Defendant is subject to personal jurisdiction in this district.

# FACTUAL ALLEGATIONS

## Plaintiffs and Their Trademarks

13.     Plaintiffs are global manufacturers and wholesale distributors of nutrition, weight-management, energy and fitness, and other personal care products (hereinafter, "Herbalife products").  Herbalife products are sold in more than 90 countries around the world, including in the United States.

14.     Plaintiffs use a direct-sales business model designed to ensure that consumers only receive products that meet their high standards.  Herbalife products are available to United States consumers exclusively through Herbalife Independent Herbalife Distributors ("Herbalife Distributors" or "Distributors"), who are independent contractors authorized and trained by Herbalife to market and sell Herbalife products.

15.     Distributors must enter into contracts with Herbalife to be permitted to sell Herbalife products.  These contracts authorize Distributors to sell Herbalife products only in certain channels and require Distributors to provide various customer services and exercise various quality controls over Herbalife products (collectively, the "Herbalife Rules").  Herbalife enforces the quality controls in the Herbalife Rules, and its ability to maintain quality controls is essential to the integrity and safety of Herbalife products, the value of Plaintiffs' trademarks, and the safety and satisfaction of consumers.

16.     Plaintiffs devote a significant amount of time, energy, and resources to protecting the value of their brands, products, name, and reputation.  By permitting Herbalife products to be distributed exclusively through Distributors, Herbalife ensures that its customers receive personal attention, accurate information about Herbalife products, and guidance for safe and proper use of Herbalife products.  Distributors also give customers personal encouragement that helps customers follow their nutritional programs and achieve their nutritional or weight-loss goals.  Distributors are also responsible for preserving the integrity of

Herbalife products through proper storage and other measures designed to ensure that customers receive fresh and undamaged products.  In the highly competitive nutrition market, quality is a fundamental part of the consumer's decision to purchase a product.  All of this contributes to the value and goodwill of the Herbalife brand.

17.    To promote and protect the Herbalife brand, Herbalife International has registered numerous trademarks with the United States Patent and Trademark Office.  These trademarks include, but are not limited to, HERBALIFE® (U.S. Trademark Registration Nos. 4,402,483, 3,324,677, 2,512,368, 1,969,346, 1,811,780, 1,254,211), HERBALIFE24® (U.S. Trademark Registration No. 4,647,525), HERBALIFELINE® (U.S. Trademark Registration No. 1,406,425), CELL ACTIVATOR® (U.S. Trademark Registration No. 3,116,689), TRI-SHIELD® (U.S. Trademark Registration No. 3,137,237), XTRA-CAL® (U.S. Trademark Registration No. 3,739,538), PROLESSA® (U.S. Trademark Registration No. 4,301,688), THERMO-BOND® (U.S. Trademark Registration No. 1,934,165), and TOTAL CONTROL® (U.S. Trademark Registration No. 2,832,678) (collectively, the "Herbalife Trademarks").

18.    Herbalife International owns the Herbalife Trademarks and has licensed them to Herbalife.  Through an agreement with Herbalife International, Herbalife also has the right to enforce and collect past and future damages for the infringement of the Herbalife Trademarks throughout the United States.

19.    The registration for each of the Herbalife Trademarks is valid, subsisting, and in full force and effect.

20.    Further, Plaintiffs' rights to use many of the Herbalife Trademarks has become incontestable under 15 U.S.C. § 1065 because the trademarks have been in continuous use, Herbalife International received no final legal decision issued against the trademarks, and Herbalife International timely filed a Section 15 Declaration describing the trademarks' use.  Accordingly, these trademarks serve

as conclusive evidence of Herbalife International's ownership of the marks and of Plaintiffs' exclusive right to use and direct the use of the marks in commerce and in connection with the sale and distribution of products bearing the marks identified in the registrations, as provided by 15 U.S.C. § 1115(b).

21.  Herbalife actively uses, advertises, and markets all of the Herbalife Trademarks in commerce throughout the United States.

22.  Due to the superior quality and exclusive distribution of Herbalife products, and because Herbalife is recognized as the source of high quality products, the Herbalife Trademarks have substantial value.

### Online Marketplaces and the Threat They Pose to Plaintiffs' Quality Controls, Reputation, and Goodwill

23.  E-commerce retail sales have exploded over the past decade. From 2009 to the end of 2020, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 14.0%. *E-Commerce Retail Sales as a Percent of Total Sales*, FEDERAL RESERVE BANK OF ST. LOUIS (February 19, 2021), https://fred.stlouisfed.org/series/ECOMPCTSA.

24.  In 2020, consumers spent $861 billion on e-commerce sales, a 44% increase from 2019. The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2020, United States consumers spent more than $296 billion in e-commerce sales on Amazon, a 38.6% increase from 2019. *See* Fareeha Ali, *U.S. ecommerce grows 44.0% in 2020*, Digital Commerce 360 (January 29, 2021), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

25.  Although online marketplaces are becoming increasingly popular among consumers, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

26.  Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch,

inspect, or interact with products before purchasing them.   Instead, consumers must trust that the product they select over the Internet will be authentic and of the quality they expect and typically receive from the manufacturer.

27.    Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.   As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

28.    Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.   It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.   See Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market*," CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.   It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces. See Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

29.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  See Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/    news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, The Washington Post, Nov. 14, 2019, https://www.washingtonpost.com/    technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

30.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue.  The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms.  The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online.  See Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*,                 Nov.                 7,                 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

31.     In its 2018 and 2019 annual reports to its shareholders, Amazon admitted that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers.  See Amazon.com, Inc., Annual Report

(Form 10-K), at 14 (Jan. 31, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x10k.htm; Amazon.com, Inc., Annual Report (Form 10-K), at 14-15 (January 30, 2020), *available at* https://ir.aboutamazon.com/static-files/63a014ac-bd47-42ce-b548-022a90d96e9a.   Amazon conceded that these actions are "violating the proprietary rights of others," and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

32. Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no way to exercise their quality controls over products sold by unauthorized sellers or ensure the products are safe and authentic. A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers—particularly when, as here, some of a brand owner's products are ingested by consumers.

33. These dangers of online marketplaces also threaten a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

34. When purchasing products on an online marketplace, customers are not informed whether a seller of a product is authorized by the manufacturer. Additionally, the interface design of many online marketplaces causes consumers to falsely believe they are always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval. Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand: [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

35. For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an

unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

36.     When a customer purchases on a marketplace and receives a product that is damaged, defective, expired, soon-to-expire, counterfeit, or otherwise poor quality, the customer is much more likely to associate that frustration with the brand/manufacturer than the product seller.

37.     Online marketplaces give disgruntled consumers a powerful and convenient forum to air their grievances about disappointing products: online product reviews.  Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers to see.  These reviews, which are often permanently fixed, will generally criticize the brand rather than the marketplace seller who sold the product.

38.     Online product reviews significantly impact a brand's reputation. Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

39.     Consumers place extraordinary trust in these online reviews.  Indeed, consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers. *Moms Place Trust in Other Consumers*, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.

40.     Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, Feb. 28, 2019,

1  https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-
2  reviews (quoting a press release from the director of the FTC).

3      41.    Because of the reliance consumers place on online reviews, negative
4  online reviews can be the death knell for a brand owner's reputation and goodwill.

5  **Plaintiffs' Reputation and Goodwill Have Been Harmed By Numerous Online**
6  **Reviews Written by Consumers Who Purchased Poor Quality Products from**
7  **Unauthorized Sellers on Online Marketplaces**

8      42.    Consumers who purchase from unauthorized sellers on online
9  marketplaces frequently receive poor quality products and leave negative reviews
10  on product listings.   These negative reviews injure consumer perceptions of a
11  brand's quality and reputation, ultimately causing the brand to suffer damage to its
12  goodwill and lost sales.

13      43.    Numerous consumers have written negative reviews of Herbalife
14  products being offered for unauthorized sale on Amazon.  In these reviews, many
15  of which appear on listings of products that have been offered for sale by
16  Defendants, consumers have complained of receiving products that were damaged,
17  expired, fake, tampered with, previously used, or of otherwise poor quality.

18      44.    For example, Defendants have sold the Herbalife product seen in the
19  screenshot below.




45.    As seen in the following screenshots, numerous consumers have left negative reviews of this product complaining of receiving products that were fake, tampered with, previously used, damaged, or expired.

Kylee Shanaghan

⭐☆☆☆☆ **FAKE ITEM**
Reviewed in the United States on January 26, 2021
Flavor: Chocolate   |   Verified Purchase

THIS IS A FAKE PRODUCT. There's puncture holes in the seal, not an official product at all. Will be demanding a refund, who knows what is in this product????

christian

⭐☆☆☆☆ **DO NOT ORDER THIS ITEM!!!**
Reviewed in the United States on December 29, 2020
Flavor: Vanilla

DO NOT PURCHASE THIS ITEM. NOT ONLY DID I RECEIVE THE WRONG ITEM, THE ITEM I RECEIVED HAD NEEDLE LIKE HOLES ALL OVER THE TOP. I SEE THIS HAS ALSO BEEN A PROBLEM WITH OTHER COSTUMERS!! VERY SCARY!

Reyna Rocha

⭐☆☆☆☆ **Unsanitary!**
Reviewed in the United States on December 16, 2020
Flavor: Vanilla   |   Verified Purchase

Container was sent without proper seal. Already used. Disgusted!!
I am not rating the product: however, how it was sent previously opened/used.

Juan y Lalis Ramirez

⭐☆☆☆☆ **Do not purchase! Not original**
Reviewed in the United States on December 7, 2020
Flavor: Vanilla   |   Verified Purchase

Do not buy ! This item is tampered with. The ingredients are strategically cut out. The container seal has holes in it and the container is halfway empty. I suspect it's not a Herbalife original product!

3 people found this helpful

Kass D

⭐☆☆☆☆ **Fake Herbalife product?**
Reviewed in the United States on November 22, 2020
Flavor: Vanilla   |   Verified Purchase

Is this a true Herbalife product? I have IBS and required to eat a stricter gluten free diet. I love Herbalife shakes because they're delicious and fall within my dietary restrictions. This product I received seems fake as hell. After drinking a few sips, I instantly had a negative reaction. I am so upset.

3 people found this helpful

1



Zoralys

★☆☆☆☆ **Yellow stuff on the powder**
Reviewed in the United States on November 8, 2020
Flavor: Vanilla | Verified Purchase

First, when I opened the container, it had holes that maybe were made with needles. That was weird. But the weirdest thing is that it has yellow stuff in the powder and I don't know what it is but I will not drink this, just in case. I'm so disappointed because it came fast.





K.

★☆☆☆☆ **Something isn't right..**
Reviewed in the United States on June 19, 2020
Flavor: Vanilla | Verified Purchase

I am wondering if this is even an authentic product.. needle-sized holes poked in the top of the container, tattered and torn label that appears to have been re-glued on, and less than 1/2 full... I've used these products for years and something doesn't seem right here.



9 people found this helpful

N

★☆☆☆☆  **Expired**

Reviewed in the United States on January 2, 2020

Flavor: Vanilla  |  **Verified Purchase**

Smells rotten probably expired

46.    Below is a screenshot of another Herbalife product Defendants have sold through their "eVolved Commerce" Amazon storefront:



Herbalife Formula1 Healthy Meal Nutritional Shake Mix – Mint Chocolate Chip, 780g/27.5Oz
Brand: Herbalife
★★★★☆ ∨    927 ratings  |  52 answered questions

Price: $40.91 ($1.49 / Ounce) & FREE Returns

Get $50 off instantly: Pay $0.00 $40.91 upon approval for the Amazon Rewards Visa Card. No annual fee.

Flavor: **mint chocolate chip**

| mint chocolate chip | orange cream |
|---|---|
| $40.91 | $41.09 |
| ($1.49 / Ounce) | ($1.56 / Ounce) |

| Brand | Herbalife |
|---|---|
| Flavor | Mint chocolate chip |
| Package Weight | 0.93 Kilograms |

47.   As seen in the following screenshots, numerous consumers have also left negative reviews of this product complaining of receiving products that were fake, tampered with, previously used, or expired.

 Alicia Gonzalez

⭐️☆☆☆☆  **Dislike**
Reviewed in the United States on December 29, 2020
Verified Purchase
True Herbalife products blend easily this one was pure water with no flavor

 Joana A.

⭐️☆☆☆☆  **Fake**
Reviewed in the United States on July 27, 2020
Flavor: mint chocolate chip  |  Verified Purchase
Run away from that seller do not buy the product is counterfeit and tastes awful.



 Noni Amariii

⭐️☆☆☆☆  FAKE DO NOT BUY
Reviewed in the United States on June 5, 2020
Flavor: mint chocolate chip  |  Verified Purchase
Its fake do not buy and something else it stung my mouth. Do not as far as i am concerned some body can get extremely sick from this! DO NOT PURCHASE THIS SHOULD BE REPORTED

One person found this helpful

 Chris

⭐️☆☆☆☆  **This product is fake**
Reviewed in the United States on March 4, 2020
Flavor: mint chocolate chip  |  Verified Purchase
Very old is from 2014 and flavor is horrible, last time I buy Herbalife here.

3 people found this helpful

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Amazon Customer**

★☆☆☆☆  **This shouldn't be like this**
Reviewed in the United States on January 11, 2020
Flavor: mint chocolate chip   |   Verified Purchase

Went to make a Drink and the safety seal was torn off prior to me obtaining this product. On top of that there is an odd smell.

One person found this helpful

    48.    Below is a screenshot of another Herbalife product Defendants have sold through their "eVolved Commerce" Amazon storefront:



Herbalife Personalized Protein Powder (360G)
Brand: Herbalife
★★★★☆   1,296 ratings  |  31 answered questions

Price: **$34.44** ($2.71 / Ounce) & FREE Returns

Get $50 off instantly: Pay $0.00 $34.44 upon approval for the Amazon Rewards Visa Card. No annual fee.

| | |
|---|---|
| Ingredients | Soy Protein Isolate, Whey Protein Concentrate, Natural Flavor and Silicon Dioxide. CONTAINS MILK AND SOY<br>See more ⌄ |
| Flavor | Unflavored |
| Brand | Herbalife |
| Item Weight | 13 Ounces |
| Package Type | Jar |

About this item

- Curb Your Hunger and Stay Energized with the power of Protein
- Add to Formula 1,or Instant shake to customize your diet plan
- A fat-free protein supplement for hunger control and healthy weight management with 5g of soy and whey protein, and all 9 essential amino acids.

    49.    As seen in the following screenshots, numerous consumers have also left negative reviews of this product complaining of receiving products that were fake, tampered with, or previously used.

 Leslie Jackson

★☆☆☆☆ **Lack of Protein powder**
Reviewed in the United States on March 9, 2021
**Verified Purchase**
I just opened my Protein powder and a third of it was missing. I'm upset that I spent this much money on powder that has a third gone.



One person found this helpful

 jason s fredericksen

★☆☆☆☆ **Half way empty**
Reviewed in the United States on December 16, 2020
**Verified Purchase**
I received my protein today and when I opened it I was got so upset cause its almost half way empty.



 Baljeet K.

★☆☆☆☆ **Fake product**
Reviewed in the United States on July 5, 2020
**Verified Purchase**
This is not worth of money. It's fake.

Kariyma king

★☆☆☆☆ **Already opened**
Reviewed in the United States on June 6, 2020
**Verified Purchase**
I've been ordering Herbalife products for about 10 years now. When you purchase any of the products and open It there is a protective sheet that you have to rip off. This protein powder did not meaning it's not safe to use and somebody already opened It.

50.   The foregoing reviews are only a small sample of the negative reviews of Herbalife products that appear on the Amazon website.

51.   Amazon does not allow product reviews to identify the seller that sold the product that is the subject of the product review.  Given that Defendants have

sold a very high volume of products bearing the Herbalife Trademarks on Amazon and are not subject to Plaintiffs' quality controls, however, it is likely that some of the foregoing negative reviews—and the many similar reviews of Herbalife products that appear on the Amazon website—were written by customers who purchased products bearing the Herbalife Trademarks from Defendants.

**Plaintiffs Prohibit Sales on Online Marketplaces, Exercise Strict Quality Controls Over the Production and Distribution of Herbalife Products, and Provide a Guarantee for Products Purchased From Distributors**

52.     To maintain quality controls over Herbalife products, Plaintiffs allow Herbalife products to be sold in the United States only by Herbalife Distributors. Herbalife enforces the quality controls that Distributors are required to follow pursuant to their contracts with Herbalife.

53.     Because of the threats to their goodwill and consumer safety that are caused by sales on online marketplaces, as discussed above, Plaintiffs strictly prohibit Distributors from selling Herbalife products on any online marketplace.

54.     The Herbalife Rules also prohibit Distributors from selling Herbalife products over any Internet website, except through a designated GoHerbalife platform.  This prohibition ensures that customers always receive products that are shipped directly from Herbalife or an Herbalife Distributor.

55.     Through its contracts, Herbalife requires Distributors to follow quality controls relating to the handling, storage, and sale of Herbalife products.  These quality controls allow Herbalife to maintain the integrity and quality of Herbalife products, guarantee that consumers receive undamaged, genuine goods, and ensure that consumers receive products that meet their specific needs.

56.     To ensure that customers receive products of the quality they have come to expect from Herbalife, Distributors are also prohibited from altering any Herbalife product, packaging, label, or accompanying literature.  Distributors may

sell Herbalife products only in their original packaging and formulation to prevent customer confusion and erosion in the quality and value of Herbalife products.

57.    The Herbalife Rules also emphasize the importance of an interpersonal relationship between customers and Distributors and require that a Distributor be assigned to each customer that purchases Herbalife products.  When selling or providing samples of Herbalife products, Distributors are required to provide directions for the safe and proper use of the products.  In order to further ensure the safety of its customers, Herbalife also instructs Distributors to recommend that customers with medical conditions or who are under medical treatment seek the advice of a physician before changing their diet.  The Herbalife Rules strictly prohibit Distributors from providing false or misleading information in connection with the distribution of Herbalife products.

58.    After completion of a sale, the Herbalife Rules require Distributors to provide their customers with retail order forms listing the product sold, as well as the Distributor's name and contact information.  The Herbalife Rules also require Distributors to retain copies of all retail receipts for two years following a customer's purchase.  These requirements facilitate communication between the customer and the Distributor with respect to any questions the customer has about the Herbalife product that he or she purchased and enables contact between the customer and the Distributor relating to consumer safety issues, including product recalls.

59.    For all these reasons, Plaintiffs limit sales of Herbalife products to Distributors who have access to, and must follow, the Herbalife Rules.  Through this limitation, Plaintiffs are able to protect the safety of consumers and maintain the integrity and reputation of the Herbalife brands.

60.    Herbalife's contracts also prohibit Distributors from selling Herbalife products to persons or entities who resell the products.  The purpose of this restrictions is to ensure that Herbalife products are sold to consumers only by

Distributors who follow Herbalife's quality controls and over whom Herbalife can exercise quality control.

61.    Herbalife provides a complete money-back satisfaction guarantee (the "Satisfaction Guarantee") to consumers who purchase Herbalife products from Distributors.  Under the Satisfaction Guarantee, a consumer who is dissatisfied with an Herbalife product for any reason can receive a refund of the purchase price within 30 days after receipt of the product.  Herbalife Distributors are required to honor the Satisfaction Guarantee for all customers who purchase Herbalife Products from them.

62.    Herbalife offers the Satisfaction Guarantee only for products that were sold by sellers who are subject to Plaintiffs' quality controls and have agreed to follow their quality controls.  Because non-Distributors are not subject to Plaintiffs' quality controls and Herbalife cannot therefore ensure the quality of products sold by non-Distributors, the Satisfaction Guarantee is not available for Herbalife products purchased from any seller that is not a Distributor.

### Herbalife's Discovery of Defendants' Sales of Products Bearing the Herbalife Trademarks on the Internet

63.    Because the unauthorized sale of Herbalife products over the Internet threatens the safety of consumers and the reputation and goodwill associated with the Herbalife Trademarks, Herbalife actively monitors the sale of Herbalife products online.

64.    Through this effort, Herbalife discovered that a high volume of products bearing the Herbalife Trademarks was being sold on Amazon through a storefront called "eVolved Commerce" (the "Amazon Storefront").

65.    On or around September 1, 2020, Amazon for the first time began requiring sellers to provide identifying information on their Amazon seller profile pages.

66.     The identifying seller information provided on the Amazon Storefront was as "Goliath Innovations, LLC, 1332 Desierto Rico Ave., El Paso, TX 79912." Upon further investigation, Herbalife identified Defendant Goliath Innovations and Defendant Hosea as operators of the Amazon Storefront.

67.     Through further investigation, Herbalife discovered that, on or around April 25, 2017, Hosea had entered into a membership agreement ("Distributor Agreement") with Herbalife.  By entering into a Distributor Agreement, Hosea agreed, among other things, to abide by the Herbalife Rules in exchange for authorization to sell Herbalife products.

68.     On or around February 5, 2018, Herbalife terminated its Distributor Agreement with Hosea after it discovered he been breaching his Distributor Agreement by selling products on unauthorized websites.   Prior to being terminated, Hosea did not respond to a letter from Herbalife alerting him that Herbalife believed Hosea breaching his Distributor Agreement.  Since February 5, 2018, Hosea has not been an Herbalife Distributor and is therefore not authorized to sell Herbalife products.

69.     Goliath Innovations is not and has never been an Herbalife Distributor.

70.     On November 23, 2020, counsel for Herbalife sent a cease-and-desist letter to Goliath Innovations and Hosea via email and email.  Herbalife's letter explained that Defendants were infringing on the Herbalife Trademarks through their online sales and tortiously interfering with Herbalife's contracts by purchasing products from Distributors, who are prohibited from selling products to non-Distributors who resell the products.   The letter also demanded that Defendants permanently cease selling products bearing the Herbalife Trademarks and disclose every person and entity that provided Defendants with the products they had listed for sale.

71.     Herbalife did not receive a response to its letter, but Defendants temporarily removed products bearing the Herbalife Trademarks from their Amazon Storefront shortly thereafter.

72.     On or before December 18, 2020, however, Defendants again began listing products bearing the Herbalife Trademarks on their Amazon Storefront.

73.     On December 18, 2020, counsel for Herbalife sent a follow-up cease-and-desist letter to Goliath Innovations and Hosea, noting that products had been relisted on their Amazon Storefront and again demanding their removal.

74.     On February 22, 2021, counsel for Herbalife sent a final cease-and-desist letter to Goliath Innovations and Hosea.  This letter again demanded that Goliath Innovations and Hosea cease selling products bearing the Herbalife Trademarks and enclosed a draft complaint against Defendants that was prepared to be filed in the United States District Court for the Central District of California.

75.     On or around February 26, 2021, counsel for Goliath Innovations and Hosea contacted Herbalife.  Counsel explained that Defendants would not cease their sales of products bearing the Herbalife Products.  Since February 26, 2021, Defendants have continued to advertise and sell products bearing the Herbalife Trademarks through their Amazon Storefront.

76.     Defendants have sold a high volume of infringing products bearing the Herbalife Trademarks through their Amazon Storefront.  Monitoring software estimates that, since January 2020, Defendants have sold more than 26,500 infringing products for revenue in excess of $1,000,000.

77.     As of the time of filing, Defendants Amazon Storefront is called "eVolved Commerce."  The "Merchant ID number" for Defendants' storefront is A2S7WTB059G58W, and the storefront can be accessed at: https://www.amazon.com/sp?seller=A2S7WTB059G58W.

78.     Upon information and belief, through their storefront on the highly interactive Amazon website, Defendants accept and fulfill orders from California

residents for products bearing the Herbalife Trademarks and cause infringing products bearing the Herbalife Trademarks to be shipped to persons located in California through the regular course of business.

79.   Herbalife's cease-and-desist letters to Goliath Innovations and Hosea informed Defendants that Plaintiffs are located in California and are harmed in California as a result of Defendants' sales of infringing products bearing Plaintiffs' trademarks to California residents.

80.   Since receiving Herbalife's cease-and-desist letters, Defendants have begun to delist and then relist their products bearing the Herbalife Trademarks at numerous times throughout the day, in apparent attempts to evade Herbalife's detection of their continues sales.

81.   Defendants' disregard of Plaintiffs' cease-and-desist letters, attempts to evade Herbalife's detection by delisting and relisting products, and continued sale of non-genuine products despite being informed of their unlawful conduct show that Defendants are acting intentionally, willfully, and maliciously.

**Defendants Are Infringing the Herbalife Trademarks by Selling Products**

**Bearing The Herbalife Trademarks That Are Not Subject To,**

**Do Not Abide By, and Interfere with Plaintiffs'**

**Quality Control and Customer Service Requirements**

82.   Defendants, without authorization from Plaintiffs, have sold—and are currently selling—products bearing the Herbalife Trademarks through their "eVolved Commerce" storefront on Amazon.  Defendants may also be selling products through additional storefronts on Amazon or other channels that Plaintiffs have not yet discovered, and cannot discover until they are able to take discovery.

83.   Plaintiffs have implemented quality control and customer service requirements throughout their authorized channels of distribution.  The products sold by Defendants are not genuine Herbalife products because they are not subject

to, and interfere with, Plaintiffs' quality control and customer service requirements that Distributors must follow.

84.   Plaintiffs' quality control and customer service requirements are legitimate and substantial.  As a result of Defendants' sales of products that are not subject to these requirements, Plaintiffs have lost control of the quality of goods that bear their trademarks.  For example, Plaintiffs have no control over whether Defendants carry out the storage and handling requirements that Distributors are required to follow or whether Defendants sell products that are damaged, defective, expired, tampered with, repackaged, or otherwise altered.

85.   Defendants are also interfering with Plaintiffs' quality control and customer service requirements, among other ways, because Plaintiffs cannot track or conduct a recall of products that Defendants sell to consumers.  Defendants also do not advise—and are not capable of advising—customers about product information and best practices for safe and optimal use of Herbalife products because, as non-Distributors, they do not have access to the approved literature and other educational materials that Distributors are given to perform these services.

86.   Negative customer reviews of Defendants' "eVolved Commerce" Amazon storefront also show that Defendants are selling products of poor quality, including products bearing the Herbalife Trademarks.

87.   For example, on July 17, 2020, Amazon user "Gram" wrote in a review of Defendants' storefront that "The Herbalife container was shipped in a paper bag and the container opened inside the packaging.  A lot of the product was inside loose in the paper bag.  I have ordered Formula 1 now for a few years and this is the first time it has arrived in other than box with appropriate bubble wrap or similar protection…."  Although Amazon added a comment stating that it takes "responsibility" for the "fulfillment experience" described in the review, the issue the consumer complained about is clearly the fault of Defendants rather than a

fulfillment problem, such as delivering a product late or to the wrong address, that could be attributable to Amazon rather than Defendants:

★☆☆☆☆ *"The Herbalife container was shipped in a paper bag and the container opened inside the packaging. A lot of the product was inside loose in the paper bag. I have ordered the Firmula 1 now for a few years and this is the first time it has arrived in other than a box with appropriate bubble wrap or similar protection. Please send a new container of Dutch Chocolate asap!"*

Read less

By Gram on July 17, 2020.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

88.   As another example, on September 26, 2020, Amazon user "Paula" reported that a product she purchased from Defendants' Amazon Storefront was "fake" and that she was "really upset!!!"  Amazon added a comment stating that it takes "responsibility" for the "fulfillment experience" described in the review, but the issue the consumer complained about—the sale of a counterfeit product—is again clearly the fault of Defendants rather than a fulfillment problem that could be attributable to Amazon rather than Defendants:

★☆☆☆☆ *"Fake product never again really upset!!!"*

By Paula on September 26, 2020.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

89.   As another example, on October 5, 2020, Amazon user "Yreid2" reported that a product bearing the Herbalife Trademarks that she purchased from Defendants had a barcode of an entirely different product on it, for Plaintiffs' "cookies and cream" shake mix product instead of their "banana caramel" shake mix.   Amazon added a comment stating that it takes "responsibility" for the "fulfillment experience" described in the review, but the issue the consumer complained about—tampering with bar codes on products—is again clearly the fault of Defendants rather than a fulfillment problem that could be attributable to Amazon rather than Defendants:

★★★☆☆ *"I ordered banana caramel and was sent cookies and cream with a banana caramel barcode on it."*

By Yreid2 on October 5, 2020.

**Message from Amazon:** This item was fulfilled by Amazon, and we take responsibility for this fulfillment experience.

90.     As another example, on May 12, 2020, Amazon user "Stephanie Waugaman" complained that a product she purchased from Defendants "was not usable as there was moisture in the container" and she was "not able to request a return or refund."

★☆☆☆☆ "Product was not usable as there was moisture in the container. Disappointed that I am not able to request a return or refund. Packaging appeared to be intact."

By Stephanie Waugaman on May 12, 2020.

91.     As another example, on April 18, 2021, Amazon user "Holly L. Sabatino reported that after she purchased a product from Defendants' storefront, she received "a cheaper knock-off instead – that retails for $75 less than we paid."

★★☆☆☆ "We ordered a Gold's Gym bench and received a cheaper knock-off instead - that retails for $75 less than we paid."

By Holly L Sabatino on April 18, 2021.

92.     As another example, on March 29, 2021, an Amazon customer complained that a product she purchased from Defendants was "not what I was expecting."

★★☆☆☆ "Just not what I was expecting"

By Amazon Customer on March 29, 2021.

93.     Negative reviews like these show that Defendants are providing poor customer service and selling products of poor quality.  Indeed, a significant reason why Plaintiffs allow Herbalife products to be sold only by Distributors who are subject to Herbalife's quality controls and prohibit Distributors from selling products on online marketplaces is to prevent customers from suffering experiences like those described in the negative reviews of Defendants' Amazon Storefront.  Given that Defendants are selling poor quality products and have sold a high volume of products bearing the Herbalife Trademarks, it is also likely that Defendants are responsible for some of the negative reviews of Herbalife products that appear elsewhere on the Amazon marketplace.  *See supra* ¶¶ 43-50.

94.    For all of these reasons, the products being sold by Defendants are also not genuine Herbalife products because they do not abide by Plaintiffs' quality control and customer service requirements that Distributors must follow.

95.    Through their unauthorized use of the Herbalife Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Herbalife products.  In reality, however, the products sold by Defendants are materially different from genuine Herbalife products because they are not subject to, do not abide by, and interfere with Plaintiffs' quality control and customer service requirements.

### Defendants Are Infringing the Herbalife Trademarks by Selling Products Bearing The Herbalife Trademarks That Do Not Come With the Herbalife Satisfaction Guarantee

96.    As set forth above, Herbalife products purchased from Distributors come with the Herbalife Satisfaction Guarantee.  Herbalife, however, does not provide the Satisfaction Guarantee for products purchased from any seller who is not a Distributor because Herbalife cannot ensure the quality of product sold by sellers that are not subject to Plaintiffs' quality controls.

97.    Because Defendants are not Distributors and, thus, are not subject to Plaintiffs' quality control requirements, the products they sell bearing the Herbalife Trademarks do not come with the Satisfaction Guarantee.

98.    Because the products Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine Herbalife products.

99.    The Satisfaction Guarantee is a material element of genuine Herbalife products.  Consumers considering whether to purchase Herbalife products would find it relevant to their purchasing decision to know whether the product they are purchasing is eligible for the Satisfaction Guarantee.  Consumers who purchase

Herbalife products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high quality product, that Herbalife stands behind the product, and that they can get a refund if they are dissatisfied with their product for any reason.

100.   Defendants' unauthorized sale of products bearing the Herbalife Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Herbalife products that come with the Satisfaction Guarantee when, in fact, they are not.

**Defendants are Tortiously Interfering with**

**Herbalife's Agreements With Its Distributors**

101.   As discussed above, Plaintiffs allow Herbalife products to be sold to U.S. consumers exclusively by Distributors.

102.   Herbalife has entered into contracts with all of its Distributors that prohibit Distributors from selling Herbalife products to entities or persons who are not Distributors and who the Distributors know, or have reason to know, are going to resell the products.

103.   Defendants have sold and are continuing to sell a high volume of products bearing the Herbalife Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Distributors.   Thus, upon information and belief, Defendants have purchased products from Distributors for the purpose of reselling them on the Internet.

104.   By purchasing products from Distributors and then reselling them on the Internet, Defendants caused and induced Distributors to breach their contracts with Herbalife.

105.   Defendants have known that Herbalife's contracts with its Distributors prohibit Distributors from selling products to third parties, such as Defendants,

whom the Distributors know or have reason to know are going to resell the products.

106.   Defendants have known of this prohibition, among other reasons, because Herbalife sent cease-and-desist letters to Defendants on November 23, 2020 and February 22, 2021 that informed them of this prohibition.  Hosea also separately knew of this prohibition before receiving Herbalife's letters because he was previously an Herbalife Distributor.

107. Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Herbalife's contracts with its Distributors by inducing Distributors to breach their contracts and sell products to Defendants that Defendants resold on the Internet.

108.   In interfering with Herbalife's contracts, Defendants acted with a wrongful purpose and engaged in an independently wrongful act.  Defendants purchased Herbalife products from Distributors—and in so doing, instigated a breach of Distributors' contracts with Herbalife—so that Defendants could unlawfully infringe upon and materially damage the value of the Herbalife Trademarks by reselling the products on the Internet, thereby committing an independent tort.

109.   If Plaintiffs learn through discovery that Defendants somehow did not obtain from any Distributor any of the Herbalife products they have sold on the Internet, Plaintiffs will dismiss their claim for tortious interference.

**Plaintiffs Have Suffered Substantial Harm**
**As A Result of Defendants' Conduct**

110.   As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, significant monetary harm including, but not limited to, loss of sales, damage to the value of their intellectual property, harm to the

goodwill associated with the Herbalife brand, and damage to their existing and potential business relations.

111.   Defendants' conduct was and is knowing, intentional, willful, malicious, wanton, and contrary to law.

112.   Plaintiffs are entitled to injunctive relief because Defendants will otherwise continue to sell products bearing the Herbalife Trademarks that are materially different from Herbalife products sold by Distributors and do not abide by Herbalife's quality controls, thereby compromising Plaintiffs' quality controls. Defendants' ongoing illegal conduct has caused and will continue to cause irreparable harm to Plaintiffs' reputation, goodwill, business relationships, intellectual property, and brand integrity.

## FIRST CAUSE OF ACTION

### Trademark Infringement

### 15 U.S.C. §§ 1114 and 1125(a)

113.   Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

114.   Plaintiffs are the owner and licensee of the Herbalife Trademarks.

115.   Plaintiffs have registered the Herbalife Trademarks with the United States Patent and Trademark Office.

116.   The Herbalife Trademarks are valid and subsisting trademarks in full force and effect.

117.   Defendants have willfully and knowingly used, and continue to use, the Herbalife Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

118.   The products that Defendants have sold bearing the Herbalife Trademarks are not authorized for sale by Plaintiffs.

119.   Defendants' use of the Herbalife Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or

deceive consumers because it suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Herbalife Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

120.   Defendants' use of the Herbalife Trademarks in connection with their sales of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Herbalife products.

121.   The products sold by Defendants are not, in fact, genuine and authentic Herbalife products.   The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Herbalife's quality control requirements that Distributors must follow.

122.   Defendants' unauthorized use of the Herbalife Trademarks has materially damaged the value of the Herbalife Trademarks, caused significant damage to Plaintiffs' business relations, and infringed the Herbalife Trademarks.

123.   As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

124.   Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Herbalife Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

125.   Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' infringement, and unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

126.   Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed the Herbalife Trademarks.

## SECOND CAUSE OF ACTION

### Unfair Competition

### 15 U.S.C. § 1125(a)(1)(A)

127.   Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

128.   Plaintiffs are the owner and licensee of the Herbalife Trademarks.

129.   Plaintiffs have registered the Herbalife Trademarks with the United States Patent and Trademark Office.

130.   The Herbalife Trademarks are valid and subsisting trademarks in full force and effect.

131.   Defendants have willfully and knowingly used, and continue to use, the Herbalife Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

132.   The products that Defendants have sold bearing the Herbalife Trademarks are not authorized for sale by Plaintiffs.

133.   Defendants' use of the Herbalife Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Herbalife Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs when they are not.

134.   Defendants' use of the Herbalife Trademarks in connection with their sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Herbalife products when they are not.

135.   Defendants' unauthorized sale of products bearing the Herbalife Trademarks and unauthorized use of the Herbalife Trademarks in advertising infringes on the Herbalife Trademarks.

136.   Defendants' unauthorized sale of products bearing the Herbalife Trademarks and unauthorized use of the Herbalife Trademarks in advertising has materially damaged the value of the Herbalife Trademarks and has caused significant damages to Plaintiffs' business relations.

137.   As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

138.   Plaintiffs are entitled to recover their damages caused by Defendants' unfair competition and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

139.   Plaintiffs are entitled to injunctive relief under 15 U.S.C. § 1116 because they have no adequate remedy at law for Defendants' actions and, unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm.

140.   Plaintiffs are entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition.

## **THIRD CAUSE OF ACTION**

### **Common Law Trademark Infringement**

141.   Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

142.   This claim arises under the common law of the State of California.

143.   Plaintiffs are the owner and licensee of the Herbalife Trademarks.

144.   Plaintiffs have registered the Herbalife Trademarks with the United States Patent and Trademark Office.

145.   The Herbalife Trademarks are valid and subsisting trademarks in full force and effect.

146.   The Herbalife Trademarks are distinctive and widely recognized by the consuming public.   Herbalife products are sold by Herbalife Distributors throughout the United States, including in California.

147.   Herbalife is widely recognized as the designated source of goods bearing the Herbalife Trademarks.

148.   Defendants have willfully and knowingly used, and continue to use, the Herbalife Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

149.   The products that Defendants have sold bearing the Herbalife Trademarks are not authorized for sale by Plaintiffs.

150.   Defendants' use of the Herbalife Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Herbalife Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

151.   Defendants' use of the Herbalife Trademarks in connection with their sales of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Herbalife products.

152.   The products sold by Defendants are not, in fact, genuine and authentic Herbalife products.   The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Herbalife's quality control requirements that Distributors must follow.

153.   Defendants' unauthorized use of the Herbalife Trademarks has materially damaged the value of the Herbalife Trademarks, caused significant damage to Plaintiffs' business relations, and infringed the Herbalife Trademarks.

154.   As a proximate result of Defendants' actions, Plaintiffs have suffered, and will continue to suffer, great damage to their business, goodwill, reputation, and profits in an amount to be proven at trial.

155.   Plaintiffs are entitled to recover their damages caused by Defendants' infringement of the Herbalife Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

156.   Plaintiffs are entitled to punitive damages because Defendants acted maliciously toward Plaintiffs or in intentional disregard of Plaintiffs' rights.

## FOURTH CAUSE OF ACTION

**Unfair Competition in Violation of Business and Professions Code § 17200,**

***et seq.***

157.   Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

158.   This claim arises under the laws of the State of California.

159.   Plaintiffs are the owner and licensee of the Herbalife Trademarks.

160.   Plaintiffs have registered the Herbalife Trademarks with the United States Patent and Trademark Office.

161.   The Herbalife Trademarks are valid and subsisting trademarks in full force and effect.

162.   Defendants have willfully and knowingly used, and continue to use, the Herbalife Trademarks in commerce for the purpose of selling products on the Internet without Plaintiffs' consent.

163.   The products that Defendants have sold bearing the Herbalife Trademarks are not authorized for sale by Plaintiffs.

164.   Defendants' use of the Herbalife Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Herbalife

Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Plaintiffs.

165.   Defendants' use of the Herbalife Trademarks in connection with their sales of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Herbalife products.

166.   The products sold by Defendants are not, in fact, genuine and authentic Herbalife products.   The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Herbalife's quality control requirements that Distributors must follow.

167.   Defendants' obtaining of Herbalife products through unlawful means and subsequent distribution or sale of the products constitutes an unfair and/or fraudulent business practice, as described in California Business and Professions Code § 17200 *et seq.* as these actions are likely to deceive and mislead the public.

168.   As a result of Defendants' unlawful actions, Plaintiffs have suffered, and continue to suffer, irreparable harm.   Plaintiffs have also suffered, and continue to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

169.   Plaintiffs are entitled to injunctive relief under Cal. Bus. & Prof. Code § 17203 because they have no adequate remedy at law for Defendants' unfair competition and, unless Defendants are permanently enjoined, Plaintiffs will suffer irreparable harm

## FIFTH CAUSE OF ACTION

### Tortious Interference with Contract and Business Relations

170.   Plaintiffs re-allege and incorporate the allegations set forth in the foregoing paragraphs as if fully set forth herein.

171.   This claim arises under the laws of the State of California.

172.   Herbalife has contracts and business relationships with its Distributors, who have a contractual right to sell Herbalife products in accordance with the Herbalife Rules.

173.   Herbalife sells Herbalife products in the United States exclusively to Herbalife Distributors, who resell the products to end-user consumers.

174.   Herbalife's contracts with its Distributors prohibit Distributors from selling or providing Herbalife products to non-Distributors who intend to resell them.

175.   Defendants have sold and are continuing to sell a high volume of products bearing the Herbalife Trademarks on the Internet.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Distributors.

176.   By purchasing products from Distributors and then reselling them on the Internet, Defendants caused and induced Distributors to breach their contracts with Herbalife.

177.   Defendants have known that Herbalife's contracts with its Distributors prohibit Distributors from selling or providing Herbalife products to non-Distributors who intend to resell them.

178.   Defendants have known of this prohibition, among other reasons, because Hosea is a former Herbalife Distributor who is familiar with Herbalife's contractual restrictions, including the prohibitions against sales to non-Distributors who resell the products.  Additionally, Herbalife informed Defendants in a cease-and-desist letter sent on November 23, 2020 that Herbalife's contracts with its Distributors prohibit the sale of Herbalife products to individuals, such as Defendants, who are not Distributors and intend to resell the products.

179.   Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Herbalife's contracts with its Distributors by inducing Distributors to breach their contracts and sell products

to Defendants that Defendants resold on the Internet.

180.   In interfering with Herbalife's contracts, Defendants acted with a wrongful purpose and engaged in an independently wrongful act.   Defendants purchased Herbalife products from Distributors—and in so doing, instigated a breach of Distributors' contracts with Herbalife—so that Defendants could unlawfully infringe upon and materially damage the value of the Herbalife Trademarks by reselling the products on the Internet, thereby committing an independent tort.

181.   Defendants are causing Distributors to breach their contracts with Herbalife when Defendants purchase products from Distributors for the purpose of resale.   Herbalife's Distributor contracts constitute a specific class of contract, even though Plaintiffs do not yet know which specific Distributor(s) have breached their contracts with Herbalife.   Herbalife cannot learn this information with certainty until it is able to take discovery from Defendants in this action, but Defendants know how they obtained the products they have sold and are on notice of the basis for Plaintiffs' claim of tortious interference.

182.   Defendants are not parties to the contracts they caused Distributors to breach.

183.   Defendants' actions have caused injury to Plaintiffs for which Plaintiffs are entitled to compensatory damages in an amount to be proven at trial.

184.   Plaintiffs are entitled to punitive damages because Defendants acted maliciously toward Plaintiffs or in intentional disregard of Plaintiffs' rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for relief and judgment as follows:

A.   Judgment in favor of Plaintiffs and against Defendants in an amount to be determined at trial, but in excess of $1,000,000, including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including

disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.    Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, and any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (collectively, the "Enjoined Parties"), as follows:

i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Herbalife products,

ii)   Prohibiting the Enjoined Parties from using any of the Herbalife Trademarks in any manner, including advertising on the Internet,

iii)  Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Herbalife products as well as any products bearing any of the Herbalife Trademarks,

iv)   Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Herbalife Trademarks including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks,

v)    Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites or storefronts any reference to

any of Herbalife's products, or any of the Herbalife Trademarks,

vi) Requiring the Enjoined Parties to take all action, including but not limited to, requesting Internet search engines (such as Google, Yahoo!, and Bing) to remove from the Internet any of the Herbalife Trademarks which associate Herbalife products or the Herbalife Trademarks with the Enjoined Parties or the Enjoined Parties' websites or storefronts,

vii) Requiring the Enjoined Parties to take all action to remove the Herbalife Trademarks from the Internet, including from the website www.amazon.com; and

viii) Requiring Defendants to destroy or return to Plaintiffs all products bearing the Herbalife Trademarks in their possession, custody, or control.

C. An award of attorneys' fees, costs, and expenses; and

D. Such other and further relief as the Court deems just, equitable and proper.

Dated:  April 22, 2021          Respectfully submitted,

*/s/ Adam C. Sherman*
VORYS, SATER, SEYMOUR AND PEASE LLP
Adam C. Sherman (SBN 224979)
  acsherman@vorys.com
Emily A. Papania (SBN 325027)
  eapapania@vorys.com
4675 MacArthur Court
Suite 700
Newport Beach, California 92660
Telephone:  (949) 526-7900
Facsimile:  (513) 852-8468

***Attorneys for Plaintiffs Herbalife International of America, Inc. and Herbalife International, Inc.***

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable.


Dated:  April 22, 2021                    Respectfully submitted,


*/s/ Adam C. Sherman*

VORYS, SATER, SEYMOUR AND PEASE LLP
Adam C. Sherman (SBN 224979)
  acsherman@vorys.com
Emily A. Papania (SBN 325027)
  eapapania@vorys.com
4675 MacArthur Court
Suite 700
Newport Beach, California 92660
Telephone:  (949) 526-7900
Facsimile:  (513) 852-8468

***Attorneys for Plaintiffs Herbalife International of America, Inc. and Herbalife International, Inc.***